Certiorari Denied, August 16, 2017, No. S-1-SC-36574

IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number:  2017-NMCA-069

Filing Date:  June 28, 2017

Docket No. A-1-CA-34260

STATE OF NEW MEXICO,

Plaintiff-Appellee,

v.

ALREE SWEAT,

Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY
Douglas R. Driggers, District Judge

Hector H. Balderas, Attorney General
Santa Fe, NM
Walter Hart, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

OPINION

WECHSLER, Judge.

{1}     Defendant Alree Sweat appeals his convictions of four counts of burglary of a vehicle, contrary to NMSA 1978, Section 30-16-3(B) (1971). Defendant's primary arguments on appeal are that the district court erred by admitting (1) "grainy" surveillance video footage, and (2) lay witness testimony identifying Defendant as the person pictured on the surveillance video. Defendant also argues that sufficient evidence does not support his convictions and that he was deprived of his constitutional right to a speedy trial.

**{2}**     For the reasons discussed herein, we first hold that the surveillance video footage was relevant and not unfairly prejudicial to Defendant, making it admissible at trial. We additionally hold that the admission of lay witness testimony identifying Defendant as the person pictured on the surveillance video was not error under the circumstances of this case and that Defendant's sufficiency of the evidence and speedy trial arguments lack merit. We therefore affirm.

**BACKGROUND**

**{3}**     On the morning of May 5, 2013, Las Cruces Police Department (LCPD) Officer Sean Terry was dispatched to investigate a reported auto burglary at the Super 8 Motel. He was, however, rerouted by dispatch to the Mesilla Valley Hospital because the complainant had left the motel to go to work. He observed that the window of Theresa Graham's white Buick LeSabre (the LeSabre) was pried open and broken. Graham reported that additional evidence was located at the Super 8 Motel. Officer Terry proceeded to the Super 8 Motel, where he discovered a blue Toyota Sienna (the Sienna) with similar damage. Officer Terry photographed the damage to both vehicles. He also viewed surveillance video footage with the manager of the motel and requested a copy of the surveillance video footage from the relevant time period (the surveillance video).

**{4}**     On May 6, 2013, LCPD Detective Michael Rickards received an email message that contained still images captured from the surveillance video. Detective Rickards recognized Defendant as the person pictured. Detective Rickards then viewed the surveillance video and noted that the person pictured was driving a dark-colored pickup truck. With this information, Detective Rickards began an investigation to determine whether Defendant owned or drove such a vehicle. As Detective Rickards was driving to Defendant's last known address, he saw Defendant standing on the side of the road next to a disabled, dark-colored pickup truck. Detective Rickards obtained the registration information and determined that Defendant owned the vehicle.

**{5}**     Given this information, Detective Rickards implemented a surveillance operation targeting Defendant. Officers stationed themselves at Defendant's house and observed that location until approximately 1:00 a.m.,[1] at which time Defendant left his house in a white Ford Mustang (the Mustang). Defendant drove through the city, ultimately parking at the Comfort Inn. New Mexico State Police Officer Daniel Lazos was assisting with the operation and positioned himself on the north side of the Comfort Inn. He saw Defendant in the northwest part of the parking lot banging on the door frame of a car. Officer Lazos then heard glass breaking, saw Defendant move to another vehicle, and heard more glass breaking. At this time, LCPD Officer Gary Pederson drove into the parking lot and parked his vehicle in close proximity to Defendant. Officer Pederson exited his vehicle and confronted Defendant, who dropped a backpack and fled on foot. Defendant ran directly toward Officer Lazos, but a rock wall separated the two. Defendant spoke to Officer Lazos as he ran by. While running away from Officer Lazos, Defendant passed directly in front of

---

[1]The next day, May 7, 2013.

Detective Rickards' vehicle. Detective Rickards identified Defendant and yelled out for Defendant to stop running. The officers searched the area but did not find Defendant.

**{6}** Crime Scene Photographer and Technician Anthony Martin photographed damage to two vehicles at the Comfort Inn: a silver Toyota Prius (the Prius) and a grey Ford F-250 (the F-250). The Mustang remained at the Comfort Inn.

**{7}** After being apprehended, Defendant participated in a custodial interview with Detective Rickards, during which they discussed the current location of property missing from the vehicles at the Super 8 Motel. Defendant denied having possession of the property and stated that "I don't remember what I got [from the Super 8 Motel]" and that "Bobby did something with it[.]"

**{8}** At trial, the State introduced the surveillance video through the testimony of Super 8 Motel manager Dipesh Gandhi. Gandhi testified that the surveillance video showed activity in the Super 8 Motel parking lot, including the "breaking of the vehicles" at issue in the case. Defendant objected to the admission of the surveillance video, claiming that, because it was "black-and-white" and "grainy," the prejudicial effect outweighed the probative value. The district court overruled the objection.

**{9}** Numerous law enforcement officers testified about their specific involvement in the investigation or the surveillance operation targeting Defendant. During Detective Rickards' testimony, the State played the surveillance video for the jury, including segments that showed (1) a dark-colored pickup truck pulling into and parking in the Super 8 Motel parking lot; (2) a person peering into the passenger side window of a white vehicle with a flashlight; and (3) a person forcibly entering the LeSabre and the Sienna. As the jury viewed the second segment, the following exchange took place:

| | |
|---|---|
| [The State:] | I'm going to draw your attention to [the portion of the surveillance video] starting with 2:20 [a.m.]. . . . Can you tell from that angle, or did you know who this [person pictured] was? |
| [Detective Rickards:] | Not at this particular moment, no. |
| [The State:] | Okay. Is this part of the video that you watched? |
| [Detective Rickards:] | Yes, it is. |
| [The State:] | When did you start to realize who you thought it was? |
| [Detective Rickards:] | As soon as he came from the passenger side window to this position, I knew immediately it was [Defendant]. |

Detective Rickards' testimony on this topic continued as follows:

[The State:]            Do you know [Defendant]?

[Detective Rickards:]  I do.

[The State:]            Does he know you?

[Detective Rickards:]  Yes, he does.

[The State:]            Does he know you by name?

[Detective Rickards:]  Yes, sir, he does.

[The State:]            And you knew him before this incident by name?

[Detective Rickards:]  Yes, I d[id].

[The State:]            So the person you identified on the video, to you, how certain were you that that was [Defendant]?

[Detective Rickards:]  I was certain.

[The State:]            How certain?

[Detective Rickards:]  100 percent.

Defendant did not object to either line of questioning. Detective Rickards also testified that Defendant's physical appearance had changed substantially during the intervening year since the incident, stating specifically that Defendant "was much thinner back then."

**{10}** The owner of the Sienna, Michael Henderson, and the driver of the F-250,[2] Sheridan Hankins, testified that they did not authorize any person to enter the vehicles. The owner of the LeSabre, Graham, and the owner of the Prius, Jay Warren, did not testify.

**{11}** Defendant moved for a directed verdict on two of the burglary of a vehicle charges at the close of the State's case, arguing that the State had failed to prove that entries into the LeSabre and the Prius were unauthorized. The district court denied this motion. Defendant was convicted on all four charges. This appeal resulted.

## ADMISSIBILITY OF THE SURVEILLANCE VIDEO

**{12}** Defendant asserts two arguments related to the admissibility of the surveillance video: (1) that the quality of the surveillance video was so poor that it lacked probative value, and (2) that the combined effect of the quality of the surveillance video and Detective

---

[2]The driver's employer owned the F-250.

Rickards' testimony opining that Defendant was the person pictured resulted in unfair prejudice to Defendant. These arguments raise evidentiary issues, which we review for abuse of discretion. *State v. Downey*, 2008-NMSC-061, ¶ 24, 145 N.M. 232, 195 P.3d 1244. A district court abuses its discretion if "the evidentiary ruling is clearly contrary to logic and the facts and circumstances of the case." *Id.* (internal quotation marks and citation omitted).

**Probative Value of the Surveillance Video**

**{13}** "Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence[.]" Rule 11-401(A) NMRA. To be relevant, a piece of evidence need not be conclusive as to a defendant's guilt, particularly when viewed in isolation from other evidence. *State v. Flores*, 2010-NMSC-002, ¶ 29, 147 N.M. 542, 226 P.3d 641. Instead, it need only have probative value from which a fact at issue may be determined. *See Black's Law Dictionary* 1397 (10th ed. 2014) (defining "probative" as "[t]ending to prove or disprove"). The fact at issue in the present case is, of course, whether Defendant burglarized two vehicles in the parking lot of the Super 8 Motel during the early morning hours of May 5, 2013.

**{14}** In *State v. Gonzales*, this Court discussed the evidentiary value of "grainy" surveillance video footage in addressing the defendant's sufficiency of the evidence argument. 2008-NMCA-146, ¶ 9, 145 N.M. 110, 194 P.3d 725. We held that the evidence was not "worthless," because a fact-finder could discern probative information, including "body type[], clothing, hair style[]" and other features. *Id.*

**{15}** The surveillance video in the present case showed that a dark-colored pickup truck pulled into the parking lot of the Super 8 Motel at approximately 2:16 a.m. Approximately five minutes after the dark-colored pickup truck parked, the same camera angle showed a person (1) peering into the passenger-side window of a white vehicle with a flashlight, (2) walking to the dark-colored pickup truck, and (3) driving away. It also showed the person's face, body type, clothing, and gait. Another camera angle recorded during the same time period showed a person (1) peering into the LeSabre and the Sienna with a flashlight, (2) forcibly entering those vehicles, and (3) removing items from the Sienna. The hat, shirt, and shorts worn by the person pictured in each camera angle appear identical.

**{16}** Defendant argues that admission of the surveillance video was error because its poor quality negated its "tendency to make the identification of the person in the video more or less probable." Although identification may be the most obvious use of the surveillance video as evidence, Defendant's argument does not address all the ways in which the surveillance video had probative value. In addition to showing the pictured person's body type and gait—information from which a person familiar with the person pictured could make an identification—the surveillance video also showed the pictured person arriving and departing in a dark-colored pickup truck and removing items from the Sienna. Considering inferences to be drawn from other admitted evidence—including Defendant's ownership of a dark-colored pickup truck and Defendant's statements to Detective Rickards related to the whereabouts of items removed from the Sienna—the content of the surveillance video is probative to a determination as to whether Defendant was the person pictured. The district

court's admission of the surveillance video was not, therefore, "clearly contrary to logic and the facts and circumstances of the case." *Downey*, 2008-NMSC-061, ¶ 24 (internal quotation marks and citation omitted).

**Substantial Risk of Unfair Prejudice**

**{17}** Rule 11-403 NMRA provides, in pertinent part, that "[t]he [district] court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]" Evidence is unfairly prejudicial if it has "an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Stanley*, 2001-NMSC-037, ¶ 17, 131 N.M. 368, 37 P.3d 85 (internal quotation marks and citation omitted). Emotional bases include those "best characterized as sensational or shocking, provoking anger, inflaming passions, or arousing overwhelmingly sympathetic reactions, or provoking hostility or revulsion or punitive impulses, or appealing entirely to emotion against reason." *Id.* (internal quotation marks and citation omitted).

**{18}** Defendant argues that the probative value of the surveillance video is outweighed by a substantial risk of unfair prejudice because Detective Rickards' identification of Defendant as the person pictured "was the only evidence of identity for the charges related to the Super 8 Motel." As discussed above, the evidence indicated that Defendant (1) owned a dark-colored pickup truck similar to the one pictured in the surveillance video, and (2) was previously in possession of items removed from the Sienna. The surveillance video is not, therefore, the only evidence related to Defendant's involvement in the incident.

**{19}** Other than his assertion as to the nature of the evidence against him, Defendant has not articulated the manner in which the combined effect of the surveillance video and Detective Rickards' testimony had "an undue tendency to suggest [a] decision on an improper basis[.]" *Id.* ¶ 17 (internal quotation marks and citation omitted); *see State v. Pitner*, 2016-NMCA-102, ¶ 13, 385 P.3d 665 (declining to review unclear or undeveloped arguments). "The purpose of Rule 11-403 is not to guard against any prejudice whatsoever, but only against the danger of *unfair* prejudice." *State v. Otto*, 2007-NMSC-012, ¶ 16, 141 N.M. 443, 157 P.3d 8 (alteration, internal quotation marks, and citation omitted). Because we discern no substantial risk of unfair prejudice, the district court's admission of the surveillance video was not "clearly contrary to logic and the facts and circumstances of the case." *Downey*, 2008-NMSC-061, ¶ 24 (internal quotation marks and citation omitted).

**LAY WITNESS IDENTIFICATION OF A DEFENDANT ON SURVEILLANCE VIDEO**

**{20}** Defendant next argues that the district court's admission of testimony by Detective Rickards in which he identified Defendant as the person pictured in the surveillance video was reversible error. Defendant did not object to Detective Rickards' testimony at trial. We therefore review for plain error. Plain error review applies to evidentiary issues not preserved at trial. Rule 11-103(E) NMRA. It only applies, however, if the allegedly erroneous testimony "affected the substantial rights of the accused" and "constituted an injustice that created grave doubts concerning the validity of the verdict." *State v. Contreras*, 1995-

NMSC-056, ¶ 23, 120 N.M. 486, 903 P.2d 228 (internal quotation marks and citation omitted).

**{21}** Photographic evidence, including surveillance videos, is admissible at trial under the "silent witness" theory. *State v. Imperial*, 2017-NMCA-040, ¶¶ 29, 31, ___ P.3d ___, *cert. denied* (No. 36,300, Mar. 9, 2017). The theoretical underpinning of the "silent witness" theory is that the photograph "speaks for itself[] and is substantive evidence of what it portrays[.]" *State v. Henderson*, 1983-NMCA-094, ¶ 8, 100 N.M. 260, 669 P.2d 736. Defendant claims that—because the surveillance video speaks for itself—Detective Rickards' testimony "invaded the province of the jury" by opining that Defendant was the person pictured rather than simply allowing the jury to view the surveillance video and draw its own conclusion. Defendant further argues that Detective Rickards' testimony was not helpful in that it provided no basis for concluding that Detective Rickards was more likely to correctly identify Defendant from the surveillance video than the jury. These arguments raise issues of first impression in New Mexico, although this Court has previously implied that a lay witness may give an opinion as to the identity of a person pictured on video. *See, e.g.*, *State v. Dombos*, 2008-NMCA-035, ¶¶ 1, 5-6, 143 N.M. 668, 180 P.3d 675 (affirming the defendant's conviction for criminal sexual penetration when the victim testified that the arm and sweater pictured on a video of the assault belonged to her husband).

**{22}** Rule 11-701 NMRA pertains to opinion testimony by lay witnesses and provides, in pertinent part, that "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is . . . helpful . . . to determining a fact in issue[.]" *See* Rule 11-701(B). As recently stated by the Illinois Supreme Court in a factually similar case, "[l]ay opinion identification testimony is helpful to a determination of whether the individual depicted in a surveillance recording is the defendant where there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." *People v. Thompson*, 2016 IL 118667, ¶ 41, 49 N.E.3d 393 (internal quotation marks and citation omitted). The *Thompson* court identified five factors that it deemed "relevant to a determination of whether a lay witness is more likely than the jury to identify the defendant correctly." *Id.* ¶ 43. These factors are (1) "the witness's general level of familiarity with the defendant's appearance"; (2) "the witness's familiarity with the defendant's appearance at the time the surveillance photograph was taken or whether the defendant was dressed in a manner similar to the individual depicted"; (3) "whether the defendant disguised his [or her] appearance at the time of the offense"; (4) "whether the defendant had altered his [or her] appearance prior to trial"; and (5) "the degree of clarity of the surveillance recording and the quality and completeness of the subject's depiction in the recording." *Id.* ¶¶ 44, 46-48. The existence of even one of these factors "indicates [that] there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." *Id.* ¶ 49 (internal quotation marks and citation omitted). We agree with the *Thompson* court's approach and adopt it for our analysis of this case.

**{23}** In *Thompson*, the defendant was charged with procurement of anhydrous ammonia—a component of methamphetamine—in violation of state law. *Id.* ¶ 4. The theft was captured on surveillance video, which was played for the jury and showed a white male

with thinning hair carrying a bucket and hose while wearing a grey t-shirt and black, baggy pants. *Id.* ¶ 8. The Hamilton County Sheriff's Department created still images from the surveillance video and circulated those images among other law enforcement agencies. *Id.* ¶ 9. Officer Brian Huff of the Mt. Vernon Police Department viewed the still image and identified the defendant. *Id.* ¶ 23. Officer Huff testified at trial that despite the blurriness of the image, "he recognized [the] defendant because he 'had previous dealings with him.' " *Id.* Although the *Thompson* court applied "precautionary procedures" that rendered Officer Huff's testimony inadmissible,[3] it concluded that Officer Huff's testimony was otherwise admissible because his previous interactions with the defendant rendered him "more likely to correctly identify [the] defendant than the jury." *Id.* ¶¶ 59, 65.

**{24}**    Defendant does not argue that he is entitled to the precautionary procedures applied in *Thompson*. Instead, he argues simply that Detective Rickards' identification was not helpful to the jury and, therefore, the jury must draw its own conclusion from the surveillance video itself. This argument fails to consider the five *Thompson* factors. First, Defendant himself describes the quality of the surveillance video as "grainy" and of "poor quality." Second, with respect to his familiarity with Defendant, Detective Rickards testified that the two have had "countless interactions," including an incident in which they were involved in a traffic accident. Finally, with respect to alterations in Defendant's appearance, Detective Rickards testified that Defendant "was much thinner" at the time of the incidents. These considerations render admissible Detective Rickards' testimony opining that Defendant is the person pictured on the surveillance video. Because Detective Rickards' testimony was admissible under the circumstances, it does not constitute plain error as argued by Defendant.

**SUFFICIENCY OF THE EVIDENCE**

**{25}**    Defendant additionally argues that sufficient evidence does not support his convictions for burglary of a vehicle. He asserts this argument in three parts: (1) as to the incident at the Super 8 Motel, (2) as to the incident at the Comfort Inn, and (3) as to the LeSabre and the Prius.

---

[3]In *Thompson*, the defendant argued, and the Illinois Supreme Court addressed, whether law enforcement officers should be prohibited from offering identification testimony based on prior interactions with criminal defendants because "a complete and uninhibited cross-examination regarding the witness's familiarity is not possible since questions could reveal information about the defendant's criminal past and unfairly cause the jury to focus on that." *Id.* ¶ 55. The *Thompson* court concluded that a defendant's ability to engage in "uninhibited cross-examination" is a question of trial tactics and, therefore, does not implicate a defendant's right to confront witnesses. *Id.* ¶¶ 55-56. However, it applied a set of "precautionary procedures" that require the trial court to (1) allow the defendant to examine the officer outside the presence of the jury, (2) limit the officer's testimony to how long he or she knew the defendant and how frequently they interacted, and (3) instruct the jury that it need not give any weight to the officer's testimony and should not draw any inferences from the fact that the witness is a law enforcement officer. *Id.* ¶ 59.

**{26}**     Our review of whether sufficient evidence supports a conviction is a two-step process. *Gonzales*, 2008-NMCA-146, ¶ 5. "[W]e view the evidence in the light most favorable to the verdict, and then we must make a legal determination of whether the evidence viewed in this manner could justify a finding by any rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt." *Id.* (internal quotation marks and citation omitted). This Court "may neither reweigh the evidence nor substitute [our] judgment for that of the jury." *State v. Sutphin*, 1988-NMSC-031, ¶ 23, 107 N.M. 126, 753 P.2d 1314. Furthermore, "[c]ontrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829.

**The Super 8 Motel**

**{27}**     Defendant claims that the evidence at trial was not sufficient to support his convictions because: (1) the dark-colored pickup truck in the video did not belong to him; (2) the person pictured on the surveillance video was not him; and (3) the LCPD did not recover any stolen property. The first and second claims raise purely factual questions, which are beyond the scope of our review. *See Sutphin*, 1988-NMSC-031, ¶ 23 ("A reviewing court may neither reweigh the evidence nor substitute its judgment for that of the jury."). The third is a contrary evidence claim, which cannot form the basis of a reversal. *See Rojo*, 1999-NMSC-001, ¶ 19 ("Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts.").

**{28}**     The surveillance video showed a dark-colored pickup truck enter the Super 8 Motel parking lot at approximately 2:16 a.m. It then showed a person—identified by Detective Rickards as Defendant—forcibly entering the LeSabre and the Sienna and removing items from the Sienna. When asked by Detective Rickards about the items taken from the Sienna during a custodial interview, Defendant responded "I don't remember what I got" and that "Bobby did something with it." Such evidence is sufficient to support Defendant's convictions with respect to the Super 8 Motel charges.

**The Comfort Inn**

**{29}**     Defendant claims that the evidence at trial was not sufficient to support his convictions because: (1) he was at home in bed at the time of the incident and (2) he loaned the Mustang to a friend that evening. Both claims point to contrary evidence, which cannot form the basis of a reversal. *See id.* ¶ 19 ("Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts.").

**{30}**     Officer Lazo testified that, after following Defendant to the Comfort Inn parking lot, he witnessed Defendant forcibly entering the F-250 and the Prius. Detective Rickards testified that Defendant abandoned the Mustang in the parking lot and fled the parking lot on foot, passing directly in front of Detective Rickards' vehicle. Such evidence is sufficient to support Defendant's convictions with respect to the Comfort Inn charges.

**The LeSabre and the Prius**

**{31}**     Defendant additionally claims that the jury instructions as given placed a burden on the State to present evidence that proved ownership of the LeSabre for Count 1 and the Prius for Count 3. We disagree.

> UJI 14-1630 NMRA provides, in pertinent part:
>> For you to find the defendant guilty of burglary [as charged in Count _____], the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
>> 1.      The defendant entered a [vehicle] [watercraft] [aircraft] [dwelling] [or] [other structure] without authorization; [the least intrusion constitutes an entry.]

*Id.* (footnotes omitted). The district court modified UJI 14-1630 and instructed the jury as follows:

> For you to find [D]efendant guilty of burglary as charged in Count 1, the [S]tate must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
>> 1.      [D]efendant entered a vehicle (2000 Buick La Sabre (sic)) owned by Theresa Graham without authorization; the least intrusion constitutes an entry[,]
>
> and
>
> For you to find [D]efendant guilty of burglary as charged in Count 3, the [S]tate must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
>> 1.      [D]efendant entered a vehicle (2011 Toyota Prius) owned by Jay Warren without authorization; the least intrusion constitutes an entry[.]

**{32}**     Although the jury instructions as given technically included ownership of the vehicles by specific persons as elements of the crimes, we have previously rejected the argument that the erroneous addition of a statutory element to a jury instruction creates an additional essential element under the applicable statute. *See State v. Carpenter*, 2016-NMCA-058, ¶ 15, 374 P.3d 744 (holding that "the sufficiency of the evidence should be assessed against the elements of the charged crime. If the jury instruction requires the jury to find guilt on those elements . . . the defendant has been accorded the procedure that this Court has required to protect the presumption of innocence" (alterations, internal quotation marks, and citation omitted) (quoting *Musacchio v. United States*, ___ U.S. ___, 136 S. Ct. 709, 713, 715 (2016)).

**{33}** Although the erroneous addition in the present case was a factual rather than a statutory element, we find the analysis articulated in *Carpenter* persuasive. Section 30-16-3(B) prohibits the unauthorized entry of "*any* vehicle." (Emphasis added.) Defendant "was properly charged with the statutory elements" of burglary, and the jury instructions gave Defendant "a meaningful opportunity to defend . . . against those charges[.]" *Carpenter*, 2016-NMCA-058, ¶ 16. The district court's erroneous addition of the owners' names to the jury instructions given did not, therefore, create an additional element to be proved beyond a reasonable doubt.

## SPEEDY TRIAL

**{34}** Finally, Defendant argues that the delay between his indictment and his trial violated his constitutional right to a speedy trial. Although Defendant made a demand immediately after his indictment, he never asserted a violation of his right to a speedy trial prior to trial. This Court discussed such a circumstance in *State v. Valdez*, from which we quote liberally:

> [The d]efendant also contends that he was denied his sixth amendment right to a speedy trial. Determination of whether a defendant has been denied his constitutional right to a speedy trial requires weighing four factors: length of the delay, reason for the delay, assertion of the right, and prejudice to the defendant. The principal stumbling block for [the] defendant is his failure to raise his constitutional claim in the district court.
>
> . . . .
>
> Because [the] defendant did not raise the constitutional claim until this appeal, there were no district court proceedings to develop fully the facts relating to the *Barker* [*v. Wingo*, 407 U.S. 514 (1972)] factors, and the district court had no opportunity to weigh them. . . .
>
> > Although [the] defendants and their counsel are allowed considerable leeway in delaying their demand for a speedy trial before the trial court, the issue must be raised at some point. A complete failure to raise it in the trial court, as was the case here, precludes our consideration of the issue on appeal, for the simple reason that there is nothing to review. There is no decision of the district court weighing the factors considered and no record from which we could independently evaluate the government's conduct.

1990-NMCA-018, ¶¶ 14-15, 109 N.M. 759, 790 P.2d 1040 (internal quotation marks and citations omitted). Our Supreme Court has similarly declined to consider speedy trial claims "absent a ruling by the district court." *State v. Collier*, 2013-NMSC-015, ¶ 41, 301 P.3d 370. "If a defendant does not raise a constitutional speedy trial issue before the district court, there is nothing for an appellate court to review." *Id.* Because Defendant did not invoke a ruling on the issue in the district court, we do not address his speedy trial argument.

**CONCLUSION**

**{35}** For the foregoing reasons, we affirm.

**{36}** **IT IS SO ORDERED.**

                _____

                **JAMES J. WECHSLER, Judge**

**WE CONCUR:**

_____

**MICHAEL E. VIGIL, Judge**

_____

**TIMOTHY L. GARCIA, Judge**